UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

ARTHUR LAUFER, Individually and on behalf of
All Others Similarly Situated,

         Plaintiff,

    v.

MERLE D. LEWIS, RICHARD HYLLAND, KIPP
D. ORME, NORTHWESTERN CORPORATION,
NORTHWESTERN CAPITAL FINANCING I,
NORTHWESTERN CAPITAL FINANCING II,
NORTHWESTERN CAPITAL FINANCING III,
MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC., MORGAN STANLEY & CO.,
INC., SALOMON SMITH BARNEY INC.,
CREDIT SUISSE FIRST BOSTON
CORPORATION and PRUDENTIAL
FINANCIAL, INC.

         Defendants.

———————————————————

**03 CV 3716**

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

**CIVIL ACTION NO.:**



Plaintiff, by his attorneys, for his Class Action Complaint, alleges the following:

**NATURE OF THE CASE**

1.  This is a securities class action on behalf of public investors who purchased the

Preferred Securities of NorthWestern Corporation ("NorthWestern" or the "Company") during

the period from November 6, 2001 to April 16, 2003 inclusive (the "Class Period').

2.  Throughout the Class Period, defendants misrepresented NorthWestern's business

operations and financial performance, overstated the Company's revenues and earnings,

maintained insufficient reserves for accounts receivables at the Company's communications

subsidiary, Expanets, Inc., and failed to disclose significant problems with the implementation of

a new "information technology system infrastructure" (the "Expert System" or "Expert") which

prevented the Company from providing financial information that was accurate and not materially misleading.

3.  On April 16, 2003 the public first learned about defendants' misrepresentations and the Company's severe problems when NorthWestern issued a press release disclosing that it would restate its reported financial results from the first three quarters of 2002 and take a restructuring charge of $878.5 million.  For the first quarter of 2002 the Company restated a net loss of $29.5 million to a wider net loss of $46.1 million; for the second quarter of 2002 it restated net income of $15.8 million to a net loss of $13.9 million, a $29.7 million difference; and for the third quarter of 2002, the Company restated a net loss of $41.3 million to a wider loss of $55.4 million.

4.  Defendants' false financial statements and their failure, among other things, to maintain adequate reserves for accounts receivable, artificially inflated the Company's earnings and the price of the Company's Preferred Securities, damaging plaintiff and the other members of the Class.

## JURISDICTION AND VENUE

5.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)], Securities and Exchange Commission Rule 10b-5 [17 C.F.R. § 240.10b-5] and Sections, 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77k, 77l(a)(2) and 77o].

6.  This Court has jurisdiction over the claims asserted in this Complaint pursuant to § 27 of the Exchange Act [15 U.S.C. § 78aa], Section 22 of the Securities Act [15 U.S.C. § 77v], and 28 U.S.C. §§ 1331 and 1337.

7.   Venue is properly laid in this judicial district pursuant § 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. §§ 1391(b) and (c).  Certain acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district.  At all relevant times, the sales of defendants' Preferred Securities took place in this District, including sales through the New York Stock Exchange.  Additionally, certain defendants maintained their corporate headquarters and principal place of business in this District, including defendants Morgan Stanley & Co., Inc., Salomon Smith Barney, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc. and Credit Suisse First Boston Corp.

8.   In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate wire and telephone communications and the facilities of the New York Stock Exchange.

## CLASS ACTION ALLEGATIONS

9.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased NorthWestern's Preferred Securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants, directors and officers of NorthWestern and their families and affiliates.

10. The members of the Class are so numerous that joinder of all members is impracticable.

11. Plaintiff's claims are typical of the claims of the members of the Class in that Plaintiff and each Class member purchased the Company's Preferred Securities during the Class Period and sustained injury as a result.

12. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

13. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to seek redress individually for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

14. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class:

(a)     Whether defendants' acts and omissions as alleged in this Complaint violated the federal securities laws;

(b)     Whether Defendants acted willfully or recklessly in omitting to state and misrepresenting material facts; and

(c)     Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

## THE PARTIES

15. Plaintiff Arthur Laufer purchased NorthWestern publicly traded Preferred Securities as detailed in the attached Certification and was damaged thereby.

16. Defendant NorthWestern is a Delaware corporation with its headquarters located at 125 South Dakota Avenue, Sioux Falls, South Dakota. At all relevant times, NorthWestern's securities, including its Preferred Securities, have been held and publicly traded on the New

4

York Stock Exchange ("NYSE"), an open and efficient market. As of April 7, 2003, millions of shares of the Company's Preferred Securities were issued and outstanding. The market for NorthWestern securities is efficient and quickly reflects all publicly available information.

17. Defendant NorthWestern Capital Financing I ("NorthWestern Capital I") is a trust organized under the laws of Delaware by NorthWestern with its principal offices located at 125 South Dakota Avenue, Sioux Falls, South Dakota. Throughout the Class Period NorthWestern Capital I had issued and registered 7.20% Trust Preferred Securities (the "Preferred B Securities"), which were listed and traded upon the NYSE under the symbol "NOR.B".

18. Defendant NorthWestern Capital Financing II ("NorthWestern Capital II") is a trust organized under the laws of Delaware by NorthWestern with its principal offices located at 125 South Dakota Avenue, Sioux Falls, South Dakota. Throughout the Class Period NorthWestern Capital II had issued and registered 8-1/4% Trust Preferred Securities, liquidation amount of $25 per security (the "Preferred C Securities"), which were listed and traded upon the NYSE under the symbol "NOR.C".

19. Defendant NorthWestern Capital Financing III ("NorthWestern Capital III") is a trust organized under the laws of Delaware by NorthWestern with its principal offices located at 125 South Dakota Avenue, Sioux Falls, South Dakota. Throughout the Class Period NorthWestern Capital III had issued and registered 8.10% Trust Preferred Securities, liquidation amount of $25 per security (the "Preferred D Securities"), which were listed and traded upon the NYSE under the symbol "NOR.D".

20. Defendant Merle D. Lewis was, at all relevant times, Chairman and Chief Executive Officer of NorthWestern.

21. Defendant Richard Hylland was, at all relevant times until April 30, 2003, the President and Chief Operating Officer of NorthWestern. On April 30, 2003, defendant Hylland resigned as President and COO effective immediately following public revelations about the improper business practices and false financial results at NorthWestern.

22. Defendant Kipp D. Orme was, at all relevant times, Vice President-Finance and Chief Financial Officer of NorthWestern.

23. Defendants Lewis, Hylland and Orme are sometimes referred to collectively herein as the "Individual Defendants."

24. NorthWestern Capital I, NorthWestern Capital II, NorthWestern Capital III and the Individual Defendants are sometimes collectively referred to herein as the "NorthWestern Defendants".

25. Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a Delaware corporation with headquarters located at 4 World Financial Center, New York, New York.

26. Defendant Merrill Lynch is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services, including underwriting services, to corporate entities and acted as a lead underwriter for Northwestern's offerings during the Class Period.

27. Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") is a Delaware corporation with its headquarters located at 1585 Broadway, New York, New York. Morgan Stanley is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services, including underwriting services, to corporate entities and acted as a lead underwriter for Northwestern's offerings during the Class Period.

6

28. Defendant Salomon Smith Barney Inc. ("Salomon") is a subsidiary of Citigroup, Inc. ("Citigroup"), a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services, including underwriting services, to corporate entities. Citigroup is a Delaware corporation with its headquarters located at 399 Park Avenue, New York, New York. Its Salomon subsidiary acted as a lead underwriter for Northwestern's offerings during the Class Period.

29. Defendant Credit Suisse First Boston Corporation ("CSFB") is a unit of Credit Suisse Group, a Swiss financial services company with its headquarters at Paradeplatz 8, P.O. Box 1 Zurich, Switzerland. CSFB is a Delaware corporation with its headquarters located at 11 Madison Avenue, New York, New York. CSFB is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services, including underwriting services, to corporate entities and acted as a lead underwriter for Northwestern's offerings during the Class Period.

30. Defendant Prudential Financial, Inc. is a financial services company that is incorporated in New Jersey with its headquarters at 751 Broad Street, Newark, New Jersey. Its Prudential Securities ("Prudential") provides commercial and investment banking services, including underwriting services, to corporate entities and acted as a lead underwriter for Northwestern's offerings during the Class Period.

31. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and prospects via access to internal corporate documents (including the Company's operating plans, budgets, accounts receivable and forecasts and reports of actual operations compared thereto), conversations in person and via email with other

corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them.

32. It is appropriate to treat the NorthWestern Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the NorthWestern Defendants directly participated in the management of the Company and the trusts, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition. The NorthWestern Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged in this Complaint, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

33. As officers and controlling persons of a publicly held company whose Preferred Securities were, and are, registered with the Securities and Exchange Commission ("SEC") and was traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and prospects and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

8

The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34. The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications described in this Complaint and were aware of, or recklessly disregarded, the misstatements contained in those statements and omissions from them and were aware of their false and materially misleading nature. Because of their Board membership and/or executive and managerial positions with NorthWestern, each of the Individual Defendants had access to the adverse undisclosed information about NorthWestern's business operations, financial condition, accounts receivable and information technology issues as set forth in this Complaint and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about NorthWestern and its business, materially false and misleading.

35. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents that were false and/or materially misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the Company's public reports and releases and is primarily liable for the misrepresentations and omissions in those reports and releases.

36. Defendants Merrill Lynch, Morgan Stanley, Salomon, CSFB and Prudential (collectively, the "Underwriter Defendants") substantially participated in the commission of the

9

wrongs set forth in this Complaint through their involvement in the Offerings of NorthWestern's Preferred Securities.  The Underwriter Defendants were at all times entities engaged in the business of investment banking, underwriting and selling securities to the investing public.  The Underwriter Defendants were the lead underwriters of the Offerings, for which they received substantial fees. Prior to the Offerings, each Underwriter Defendant was required to and did conduct an investigation into NorthWestern's business, operations, prospects, financial condition and accounting and management control systems, known as a "due diligence investigation."  In the course of this investigation, the Underwriter Defendants would have obtained knowledge of the facts alleged in this Complaint if they had acted with reasonable care.  At all relevant times, defendants had a duty to disseminate, promptly, truthful and accurate information with respect to NorthWestern  and its affairs.

37. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of NorthWestern securities by disseminating materially false and materially misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding NorthWestern's business, operations, management and the intrinsic value of NorthWestern Preferred Securities and caused plaintiff and other members of the Class to purchase NorthWestern Preferred Securities at artificially inflated prices.

38. Because of the Individual Defendants' positions with the Company and the Underwriter Defendants' work for the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual

operations, including reports regarding information technology issues), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees and via reports and other information provided to them.

39. Each defendant is liable for artificially inflating the price of NorthWestern's Preferred Securities by making false and materially misleading statements and omitting material adverse information about the Company. The defendants' wrongful course of business (i) artificially inflated the price of North Western's Preferred Securities during the Class Period; (ii) deceived the investing public, including plaintiff and other Class members, into acquiring NorthWestern's Preferred Securities at artificially inflated prices; and (iii) permitted NorthWestern to appear to grow and to benefit economically from the wrongful course of conduct.

## SUBSTANTIVE ALLEGATIONS

40. NorthWestern is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest. It also has made significant investments in three non-energy businesses: (i) Expanets, Inc. ("Expanets"), which is a Delaware corporation with operations in 213 locations in 50 states providing integrated communication and data solutions and network services to small and medium-sized businesses; (ii) CornerStone Propane Partners, L.P. ("CornerStone"), a publicly traded master limited partnership, the nation's fifth largest publicly held retail propane distributor, providing services to residential, commercial, industrial and agricultural customers in 34 states; and (iii) Blue Dot Services, Inc. ("Blue Dot"), a Delaware corporation that provides air conditioning, heating, plumbing and related services, with operations at 77 locations in 27 states.

11

41. At all relevant times, NorthWestern was a publicly traded company whose securities traded on the New York Stock Exchange. During the Class Period, it had millions of shares of Preferred Securities that were issued and outstanding which traded on the NYSE.

42. During the Class Period, defendants repeatedly misrepresented the results of the Company's operations and created the false impression that the Company had sufficient assets and was performing well. As the public would later learn, NorthWestern was being crippled by severe problems and was reporting materially false and misleading financial results which artificially inflated the price of its Preferred Securities. Ultimately, the Company would take a charge of $878.5 million and reduce its reported income for the first three quarters of 2002 by more than $60 million.

43. On November 6, 2001, the beginning of the Class Period, the NorthWestern Defendants issued a press release announcing the Company's third quarter 2001 financial results in which defendant Hylland represented that the Company had implemented an information technology system which was fully operational:

> We continue to aggressively target substantial productivity enhancements and cost efficiencies as we integrate the Expanets businesses. An important step toward improving performance is expected to occur after November as the majority of our information technology system infrastructure is put in place and fully operational. Further, our comprehensive review of Expanets' cost structure is ongoing and while significant costs have already been removed to address market conditions, we will continue to identify opportunities for further cost efficiencies while still supporting our focus on growth and higher margin sales. **Expanets is targeted to enter 2002 with the majority of these migration/integration activities completed and will be well positioned to capitalize on its market leadership position. Expanets' EBITDA forecast for 2003 remains at $100 million, and we expect to be substantially on our way to that**

> **performance level during 2002 through these substantial development activities.**

(emphasis supplied).

44. As the Company would later admit, by this time, the Company was being crippled by significant deficiencies in its billing and collection systems which was so dysfunctional that defendants could not obtain reliable information from it about NorthWestern's revenues, receivables, collections and financial results.

45. Despite these problems and the NorthWestern Defendants' inability to provide accurate financial information, defendants continued to make materially false and misleading statements in order to sell millions of Preferred Securities to the unsuspecting public.

46. On December 21, 2001, defendants sold 4 million shares of the Company's 8.25% Preferred Shares and on January 5, 2002 sold an additional 270,000 of those Preferred Shares pursuant to a Registration Statement and Prospectus which defendant Hylland signed with the permission, and at the direction, of NorthWestern and the Individual Defendants. Those offering documents were materially false and misleading because they failed to disclose the severe problems that were crippling NorthWestern, including the significant deficiencies in the Company's billing and collection system which prevented defendants from providing accurate financial information, including information about the Company's revenues, receivables and collection. As the public would later learn, defendants artificially inflated the Company's revenues and underreported its accounts receivables, reserves and write-offs.

47. On or about January 25, 2002, defendants sold 4 million shares of the Company's 8.10% trust Preferred Securities pursuant to a Registration Statement and Prospectus Supplement and on February 5, 2002 sold an additional 440,000 shares of its 8.10% trust Preferred Securities pursuant to a Registration Statement and Prospectus Supplement. As a result of the offerings the

Company received $107.4 million in net proceeds. Nowhere in the offering documents or in their other public statements did defendants disclose the severe problems that were plaguing the Company which would be revealed in April 2003,

48. Among other things, defendants failed to disclose that they had been experiencing severe problems with the Expert System since at least November 2001 and that, as a result, defendants could not obtain material information in order to provide accurate financial information to the market about the Company's results and operations. Instead, defendants continued to report false financial results, mislead the market about NorthWestern's business and omitted to disclose the severe problems that the Company was experiencing with its data and information systems.

49. On February 7, 2002, defendants issued a press release entitled, "NorthWestern Reports 2001 BPS Of $2.03 Before Restructuring Charges; Reaffirms 2002 BPS Guidance Of $2.30 To $2.55." The press release included a statement by defendant Lewis and stated in pertinent part:

> SIOUX FALLS. SD. — Feb. 7. 2002 — NorthWestern Corporation (NYSE:NOR) today reported full-year 2001 net income of $56.7 million or $2.03 per diluted share before restructuring charges, up 11 percent from the $49.6 million or $1.83 per diluted share reported in 2000. These results are in line with previously announced expectations of between $2.00 and $2.03 earnings per share before charges.
>
> "In addition to our reported recurring results of $2.03 per share, **we have made substantial progress to further strengthen our energy and communications businesses for long-term growth and value creation,**" said Merle D. Lewis, NorthWestern's chairman and chief executive officer. "NorthWestern's businesses are positioned to achieve improved performance, and we reaffirm our previously announced 2002 earnings per share guidance of between $2.30 to $2.55."

14

Revenues for the fourth quarter of 2001 were $797 million, compared with $2.5 billion in the same quarter in 2000. Revenues for full-year 2001 were $4.2 billion, down from $7.1 billion in 2000. Revenues for both the fourth quarter and full-year 2001 were lower due primarily to the sale and exit of certain natural gas and crude oil businesses of Cornerstone Propane along with lower commodity prices.

Business Segment Results

* * *

Fourth quarter results for Expanets, NorthWestern's communications business, showed continued improvement, with EBITDA before restructuring charges reflecting a loss of $1.6 million, compared with a loss of $13.2 million for the same quarter in 2000. Further, the fourth quarter 2001 results include approximately $10 million in identified nonrecurring transition and integration costs as **Expanets advanced the migration of its business toward a common information technology platform.** SG&A expenses for the fourth quarter reflect a reduction of $25.4 million, or 23 percent, from the same quarter in 2000 and a reduction of $19.9 million, or 19 percent, from the third quarter of 2001, representing actions taken by the company to resize its business and reduce its cost structure. For the full year, Expanets reported an EBITDA loss before nonrecurring charges *of* $47.5 million, of which $37.7 million occurred during the first quarter prior to the restructuring of Expanets' agreement with Avaya, Inc., compared with positive EBITDA of $12.6 million in 2000. Identified nonrecurring transition and integration costs totaled $36 million during 2001 and $24 million in 2000. Revenues for fourth quarter 2001 were $217.5 million, compared with $293.5 million in fourth quarter 2000. For the full year, revenues were $1.0 billion, compared with $1.1 billion in 2000.

**"Expanets took several important steps during the fourth quarter and throughout the year that should provide major building blocks for achieving its targets in 2002. First, the company further resized its cost structure and substantially reduced expenses to reflect changing market conditions in the communications industry. In late November, Expanets also introduced a new information technology system infrastructure that when fully implemented should enable the company to more efficiently develop and deploy communications solutions for clients while reducing operating expenses.** This project is part of Expanets' previously announced

plan to exit from the costly transition services agreements entered into in connection with the purchase of the Growing and Emerging Markets (GEM) division of Lucent Technologies. **This is an extensive project involving substantial data migration from third-party legacy systems to the new Expands system and the launching of a new integrated customer care, billing, order processing and information technology system. Expanets' process teams addressed initial delays in the integration of the new system and continue to make progress toward full implementation of the system," Hylland said.** (Emphasis added.)

* * *

50. On March 13, 2002 the NorthWestern Defendants completed an Offering pursuant to a Registration Statement and Prospectus for $250 million of the Company's 7 7/8% senior notes due on March 15, 2007 and $470 million of its 8 3/4 % senior notes due on March 15, 2002 which resulted in net proceeds to the Company of $713.9 million. Nowhere in the offering documents or in their other public statements did defendants disclose the severe problems that were plaguing the Company which would be revealed in April 2003.

51. On April 1, 2002, NorthWestern filed with the SEC its Form 10-K for 2001. The Form 10-K was signed by defendants Lewis, Hylland and Orme. In the Form 10-K defendants repeated the financial results reported in the February 7, 2002 press release. Additionally, the Form 10-K described the "Expert System"— the "new information technology system infrastructure" discussed in the February 7, 2002, press release. The description of the Expert System in the Form 10-K stated:

> Throughout 2001, and as part of our overall corporate initiative, Expanets developed and implemented an "Operational Excellence" plan which is intended to combine "best practices" with scale efficiencies and cost reductions. As part of this plan, during 2001, Expanets developed and began implementation of the "Expert System," which, using a combination of Oracle and Siebel software, gives it a central and common platform from which all aspects of its business can be operated and managed, including

16

order entry, scheduling, forecasting, customer billing, trend analysis, compensation and margin calculation, product support, sales support and financial reporting. The design, construction and implementation of the "Expert System" resulted in approximately $21 .4 million in expenses and approximately $58.7 million in capital costs during 2001 and entailed significant manpower and energy. **Delays in implementation of the "Expert System" and less than full functionality of the "Expert System" following its initial use in late November 2001 caused further negative effects on Expanets' 2001 fiscal year performance. While Expanets is addressing these issues, it expects that they will adversely affect its performance to some degree through the first two quarters of fiscal year 2002. Notwithstanding these challenges, Expanets believes that the "Expert System" will provide a strong platform to achieve its operating strategy.** (Emphasis added.)

52. Defendants knew or recklessly disregarded that the results described in the February 7, 2002 press release and the April 1, 2002 Form 10-K as well as the Registration Statements and Prospectuses for the Offerings in December, 2001 and on January 31, 2002, February 5, 2002 and March 13, 2002 were false and misleading because the Company's financial performance was artificially inflated and because of the severe problems with the Company's enterprise software platform. As the public would later learn, defendants misrepresented and failed to disclose the massive problems they had been encountering since at least November 2001 in implementing the Expert System and their other systems for data management.

53. On April 30, 2002, NorthWestern issued a press release titled, "NorthWestern Corporation Reports First Quarter 2002 EPS Of 65 Cents From Continuing Operations." The press release reported NorthWestern's purported financial results and claimed, in part, that "implementation of... EXPERT, made significant strides during the first quarter and that order management and billing activities are fully operational." The press release included a statement by defendant Lewis and stated in pertinent part:

17

SIOUX FALLS, S.D. — April 30, 2002 — **NorthWestern Corporation (NYSE:NOR) today reported first quarter 2002 income from continuing operations of $24.0 million or 65 cents per diluted share,** before extraordinary charges and discontinued operations, compared with income from continuing operations of $13.2 million or 48 cents per diluted share in the first quarter of 2001. Results for the first quarter would have increased by an additional 23 cents per share with the inclusion of January 2002 results from the recently acquired Montana Power energy operations.

**"Our energy and communications businesses posted strong first quarter results from continuing operations with the addition of the former Montana Power operations to NorthWestern Energy's results, effective Feb. 1, 2002, and <u>substantial improvement as we expected in operating results from our communications business, Expanets,</u>"** said Merle D. Lewis, NorthWestern's chairman and chief executive officer. "We are well positioned to deliver on our operating plans for 2002 and continue to have confidence in our previously announced 2002 earnings target of $2.30 to $2.55 per share from continuing operations."

**Revenues from continuing operations for the first quarter of 2002 were $480.1 million,** compared with $477.6 million in the same quarter in 2001. Revenues from continuing operations increased during the first quarter with the addition of NorthWestern Energy's Montana operations. However, first quarter revenues reflect reduced energy commodity prices, lower communications revenues as a result of efforts to build a stronger base of recurring, higher-margin sales, and soft consumer spending impacting sales of energy-related heating, ventilation and air conditioning services.

\* \* \*

[Chief Operating Officer Richard R.] **Hylland said that the implementation of Expanets' new information technology system infrastructure, known as EXPERT, made significant strides during the first quarter and that <u>order management and billing activities are fully operational</u>. "The EXPERT system implementation has already delivered substantial savings by enabling Expanets to reduce costly service agreements created as a part of Expanets' purchase of the Growing and Emerging Markets (GEM) division of Latent Technologies.** Also in March. Expanets established the Expanets Technical Assistance Center (ETAC) through a new market-driven

outsourcing agreement with Avaya to provide warranty repair and maintenance service for customers with Avaya-supported solutions. While the agreement is focused on improving service excellence to Expanets' customers, it also replaces the last of the costly transitional service agreements between Expanets and Avaya, and should deliver significant additional cost savings." (Emphasis added.)

Blue Dot, NorthWestern's energy-related heating, ventilation and air conditioning services provider, reported first quarter 2002 negative EBITDA of $888 thousand, compared to positive EBITDA of $2.2 million in same quarter in 2001. Revenues declined to $94.5 million in the first quarter of 2002 from $99.6 million in the first quarter of 2001 due to mild weather, the exit of certain business lines and soft consumer confidence and spending.

"Blue Dot's first quarter EBITDA results are traditionally less than five percent of its full-year results. In addition, the company made the operating decision to keep its workforce in place during the quarter so that it would be in a position to take advantage of increasing seasonal business activity in the second and third quarters," said Hylland. "Blue Dot continues to make progress toward improving its operations and performance by aggressively managing underperforming locations, focusing on profitable sales initiatives, completing Operational Excellence initiatives, including the relocation of the company's headquarters to Sioux Falls, which will result in savings of more than $4 million annually, and implementing a new vehicle sale/leaseback transaction that will reduce its capital expenditures by $10 to $12 million annually."

* * *

54. On May 15, 2002, the NorthWestern Defendants caused NorthWestern to file with the SEC its Form 10-Q for the first quarter of 2002 which was signed by defendant Orme. In the Form 10-Q, defendants represented that "all adjustments necessary for a fair presentation of the results of operations for the interim periods have been included." Defendants also repeated the financial results that they had reported in the April 30, 2002 press release and represented that for the first quarter of 2002 NorthWestern had a net loss of $29.48 million.

55. On May 17, 2002, as part of its reaffirmation of projected earnings per share of $2.30 to $2.55 for 2002, the Northwestern Defendants caused NorthWestern to state the following:

> As previously discussed in the company's first quarter analysts conference call on May 1, 2002, NorthWestern's accounts receivables rose $93 million in the first quarter primarily due to certain delays in billings experienced in connection with the implementation of the new integrated information technology platform at Expanets. The implementation delays have been addressed, and NorthWestern expects its accounts receivables to be reduced to normal levels over the next several months." [emphasis added.]

56. In fact, defendants knew or recklessly disregarded that the results reported in the April 30, 2002 press release and the May 15, 2002 Form 10-Q, as well as the statements in the May 17, 2002 press release, were false and misleading because the Company's financial performance was artificially inflated and because the Company had maintained inadequate reserves for accounts receivable. As defendants would later admit on April 16, 2003 the Company actually had a net loss of $46.1 million for the first quarter of 2002 and the Expert System was so dysfunctional that defendants could not obtain reliable information from it about NorthWestern's financial results. Further, defendants failed to fully disclose billing problems and billing lapses and data conversion issues in customer accounts stemming from the implementation of Expanets' enterprise software platform.

57. On August 8, 2002, defendants caused NorthWestern to issue a press release titled, "NorthWestern Corporation Reports Second Quarter 2002 EPS Of 49 Cents From Continuing Operations; Operating Income Reaches $83.5 Million." This press release stated that the Company's second quarter earnings were $0.49 per share, compared with earnings of $0.47 per share for the same period a year earlier. The press release included a statement by defendant Lewis and stated in pertinent part:

SIOUX FALLS, S.D. Aug. 8, 2002 — **NorthWestern Corporation (NYSE:NOR) today reported second quarter 2002 income from continuing operations of $20.9 million, or 49 cents per diluted share** before discontinued operations, compared with $12.8 million, or 47 cents per diluted share in the second quarter of 2001. For the six months that ended June 30, 2002, income from continuing operations was $44.8 million, or $1.13 per diluted share before discontinued operations, compared with $26.0 million, or 95 cents per diluted share during the prior year period. Results for the first half of 2002 would have increased an additional 23 cents per share with the inclusion of January 2002 results from the acquired Montana energy operations.

"Strong results from our energy businesses, which account for more than 70 percent of North Westerns operating income, coupled with outstanding performance from our communications business, led to solid second quarter and first half results," said Merle D. Lewis, NorthWestern's chairman and chief executive officer. "We are excited about the growth in cash flows from our continuing operations and remain on track to meet our previously announced fail-year earnings target of $2.30 to $2.55 per share from continuing operations."

Revenues from continuing operations for the second quarter of 2002 increased to $515.7 million, compared with $476.8 million in the same quarter in 2001. For the first half of 2002, revenues from continuing operations were $995.8 million, compared with $954.4 million in the first half of 2001. Revenues from continuing operations increased during the second quarter and the first half of 2002 because of the addition of NorthWestern Energy's operations in Montana. However, second quarter and first half revenues were impacted by lower energy commodity prices and decreased communications revenues stemming from efforts to focus on higher-margin recurring sales as well as continuing soft market conditions.

North Western's operating income for the second quarter of 2002 increased to 348.8 million, compared with an operating loss of $3.2 million in the second quarter of 2001. For the first half of 2002, operating income was $83.5 million, compared with an operating loss of $40.3 million in the first half of 2001. For the first six months of 2002, cash flows from continuing operations increased to $52.2 million, compared with cash flows from continuing operations of $37.5 million in the first half of 2001.

* * *

Second quarter 2002 results for Expanets, NorthWestern's
communications services business, were significantly improved
with $11.0 million in operating income and $24.9 million in
EBITDA, compared with an operating loss of $14.6 million and
negative EBITDA of $2.0 million in the same quarter in 2001. For
the first half of 2002, Expanets had operating income of $8.3
million and EBITDA of $33.5 million, compared with an operating
loss of $63.3 million and negative EBITDA of $39.7 million in the
first half of 2001. Revenues for the second quarter of 2002 were
$210.3 million, representing an increase of 4.1 percent over
revenues in the first quarter of 2002. Revenues for the second
quarter and first half of 2002 decreased $91 million and $157.9
million, respectively, in comparison with the same periods for
2001, reflecting Expanets' efforts to focus on building higher-
margin sales and soft market conditions.

**"Expanets' outstanding performance during the first half of
2002 confirms the strength of our mid-market communications
services business strategy**. As the largest U.S. mid-market
communications services and solutions company, Expanets has the
flexibility to respond effectively to changing market conditions by
transforming its cost structure, Expanets' cost structure
improvement and increased sales focus on value-added services
and applications improved gross margins as a percentage of
revenues to 44.5 percent for the second quarter of 2002 and 41.4
percent for the first six months of 2002, compared with gross
margins as a percentage of revenues of 38.0 percent in the second
quarter and 34.6 percent of the first half of 2001," Hylland said.
"Expanets successfully reduced sales, general and administrative
(SG&A) expenses as a percentage of revenues in the second
quarter of 2002 to 32.7 percent from 38.6 percent of revenues in
the second quarter of 2001. Despite soft market conditions, we
expect Expanets to continue a strong performance in the remaining
two quarters of 2002. and we are comfortable with our previously
announced flail-year 2002 EBITDA target of $80 to $87 million
and an annualized EBITDA run rate in excess of $100 million in
2003.'

* * *

Hylland also said that **NorthWestern's Operational Excellence
initiatives have achieved $110 million in reduced expenses on a
consolidated basis during the first half of 2002 which has
resulted in the company's SG&A as a percent of revenues
declining to 32.2 percent, compared with 36.0 percent in the**

**first half of 2001. "The first phase of our operational excellence initiatives have included significant efficiency programs ranging from resizing our cost structure to shared support services between operations, leveraged purchasing and other business improvements. While these efforts have been extremely successful, we will be implementing a second phase of initiatives beginning in the third quarter that are focused on customer facing enhancements, operating processes and information system re-engineering which we believe will further improve our customer service capabilities, drive revenue growth and continue to reduce our cost structure,"** Hylland said. "Our efforts are now targeting up to $170 million in annualized SG&A reductions and we are focusing on reducing our SG&A as a percentage of revenues to below 30 percent by year end 2002." (Emphasis added.)

Kipp D. Orme, vice president and chief financial officer, said that the transition of independent auditors to Deloitte & Touche has gone smoothly since the firm was selected by NorthWestern's audit committee and the Board of Directors in May 2002. Deloitte & Touche has nearly completed its review of North Western's second quarter results that will be filed on Form 10-Q on Aug. 14,2002. As previously disclosed, NorthWestern implemented, effective Jan, 1, 2002, the new accounting standard, Statement of Financial Accounting Standards No. 142, Goodwill and Other Intangible Assets, which eliminates the requirement to amortize goodwill and limits amortization of other intangibles to instances where the assets have a finite determinable life. Orme said that an independent, third-party assessment has recently been completed and that NorthWestern believes that there will be no impairment to goodwill or other intangibles resulting from the adoption of SFAS No. 142.

          \* \* \*

58. On August 14, 2002, the NorthWestern Defendants caused NorthWestern to file with the SEC its Form 10-Q for second quarter 2002 which was signed by defendant Orme. In the 10-Q, the NorthWestern defendants repeated the financial results reported in the August 8, 2002 press release and represented to the market that the Company had net income of $15.8 million for the second quarter. Those defendants also represented that "all adjustments necessary for a fair presentation of the results of operations for the interim periods have been included."

23

59. That same day, August 14, 2002, NorthWestern filed a Form 8-K reporting that defendants Lewis and Orme had "submitted to the SEC sworn statements pursuant to Securities and Exchange Commission Order No. 4-460." In his statement, defendant Lewis assured investors that the Company's SEC reports did not contain any "untrue statement of a material fact as of the end of the period covered by such report" and no Company report "omitted to state a material fact necessary to make the statements in the covered report in light of the circumstances under which they were made, not misleading as of the end of the period covered by such report." Likewise, defendant Orme assured the public that "no covered report contained an untrue statement of a material fact as of the end of the period covered by such report" and "no covered report omitted to state a material fact necessary to make the statements in the covered report, in light of the circumstances under which they were made, not misleading as of the end of the period covered by such report."

60. As the public would learn on April 16, 2003, these representations by the Northwestern Defendants were materially false and misleading because, instead of net income of $15.8 million, the Company actually had a net loss of $13.9 million for the second quarter of 2002. In addition, when they issued the August 8, 2002 press release and the August 14, 2002 Form 10-Q, defendants were not able to accurately assess the Company's financial condition because of the severe billing problems and billing lapses and data conversion issues in customer accounts stemming from the implementation of Expanets' enterprise software platform. As a result, defendants knew or recklessly disregarded that the results reported in the August 8, 2002 press release and the August 14, 2002 Form 10-Q were materially false and misleading because the Company's financial performance was artificially inflated and because the Company had maintained inadequate reserves for accounts receivable at the Company's subsidiary, Expanets.

24

61. On October 3, 2002, defendants caused NorthWestern to file with the SEC a Form 424B2 Prospectus Supplement for a public offering of 10 million shares of NorthWestern common stock at $8.75 per share.

62. In the Prospectus Supplement, defendants repeated the false financial results that they had previously reported for the first and second quarters of 2002. In addition, at pages S-30 and S-31, defendants represented that the financial statements presented in the Form 424B2 "reflect all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of our results of operations and financial position for such periods."

63. In a section titled "Communications Segment Operations," the Prospectus Supplement stated, in pertinent part, that:

> In November 2001, Expanets installed an enterprise software system, the EXPERT system, and although additional costs have been incurred during 2002 to enhance the system's operational capabilities, **the system has eliminated redundant costs incurred under the former transition service agreements executed with Avaya as part of the original Lucent GEM acquisition. The <u>system is now operational </u>and savings are expected to continue throughout 2002 both from efficiencies and the reduction of non-capitalizable integration costs from the project.**
>
> While the EXPERT system is currently in use, Expanets has experienced complications in certain system areas, particularly billings and collections. Management is currently addressing the problems and anticipates that the system will be fully operational during the first quarter 2002, but additional costs may likely be incurred prior to completion. (Emphasis added.)

64. The NorthWestern Defendants knew or recklessly disregarded that the reported financial results were materially false and misleading and that the description of Expanets' enterprise software platform in the Prospectus Supplement was materially false and misleading because it failed to disclose fully the problems with implementation of the Expert System and

also failed to disclose fully the billing lapses and data conversion issues in customer accounts stemming from the implementation of Expanets' enterprise software platform.

65. On October 8, 2002, the Company completed the Offering of 10 million shares, raising $81 million of net proceeds.

66. On November 7, 2002, the NorthWestern Defendants caused NorthWestern to issue a press release entitled, "NorthWestern Reports Third Quarter 2002 Earnings of 25 Cents Per Share from Continuing Operations." This press release misrepresented that the Company's third quarter earnings were $0.25 per share compared with earnings of $0.52 per share in the third quarter of 2001. The press release included a statement by defendant Lewis and stated in pertinent part:

> Operating Income for Nine Months 2002 Increases to $129.0 Million; Cash Flows from Continuing Operations Reach $109.5 Million Board Declares Quarterly Dividend Unchanged at 313/4 Cents
>
> SIOUX FALLS, S.D. — Nov. 7, 2002 — NorthWestern Corporation (NYSE:NOR) today reported third quarter 2002 income from continuing operations of $14.6 million, or 25 cents per diluted share, compared with $14.1 million, or 52 cents per diluted share in the third quarter of 2001. For the nine months that ended Sept. 30, 2002, income from continuing operations was $59.5 million, or $1.38 per diluted share, compared with $40.1 million, or $1.47 per diluted share during the prior year period.
>
> Operating income from continuing operations for the third quarter of 2002 was $45.5 million, compared with an operating loss of $12.1 million in the third quarter of 2001. For the nine months ended Sept. 30, 2002, operating income from continuing operations was $129.0 million, compared with an operating loss of $52.5 million in the nine-month period in 2001.
>
> "Our year-over-year operating income for the third quarter of 2002 benefited from continued strong performance from our regulated energy business and improvement from our communications business," said Merle D. Lewis, chairman and chief executive officer. "**North Western continues to focus on operational**

26

**excellence initiatives that maximize free cash flow by driving improved performance from our energy and communications businesses through enhanced efficiencies and asset optimization.** We are also working to further improve our financial position by monetizing non-strategic assets. By increasing free cash flow and monetizing non-strategic assets, we will continue executing our plan to increase liquidity."

Revenues for the third quarter of 2002 were $509.3 million, compared with $398.7 million in the same quarter in 2001. For the nine months ended Sept. 30, 2002, revenues were $1.51 billion, compared with $1.35 billion for the same period in 2001. Revenues from continuing operations increased during the third quarter and the nine-month period of 2002 due to the addition of NorthWestern Energy's operations in Montana, which was partially offset by decreased communications revenues resulting from continuing soft market conditions and efforts to focus on higher-margin recurring sales.

Cash flows from continuing operations for the nine-month period of 2002 were $109.5 million, compared with $106.0 million during the nine-month period of 2001. Cash flows from continuing operations increased $52.2 million during the third quarter of 2002 from the second quarter of 2002.

NorthWestern completed an offering of 10 million common shares that raised $83.1 million in net proceeds in October 2002 as part of its ongoing equity program to enhance balance sheet strength by reducing debt and to favorably impact financial ratios. As of Nov. 6, 2002, NorthWestern had in excess of $165 million in cash and cash equivalents and availability on an existing revolving credit facility. Also, NorthWestern's total debt has decreased by approximately $85 million since Sept. 30, 2002.

* * *

Expanets, NorthWestern's communications services business and the nation's largest communications solutions provider to the mid-market, continued to demonstrate improved results during the third quarter of 2002 with operating income of $8.7 million and EBITDA of $22.6 million, compared with an operating loss of $18.8 million and negative EBITDA of $6.1 million for the third quarter of 2001. For the nine months ended Sept. 30, 2002, Expanets reported operating income of $17.0 million and EBITDA of $56.2 million, compared with an operating loss of $82.1 million and negative EBITDA of $45.9 million for the same period of

2001. Revenues for the third quarter of 2002 were $183.3 million and for the nine months of 2002 were $595.5 million. Revenues declined $61.2 million and $219.0 million for third quarter and nine months of 2002, respectively, compared with the same periods in 2001. The decline in revenues was due in part to continued soft communications market conditions and Expanets' increased focus on higher-margin sales.

"For the third consecutive quarter, Expanets posted improvement in year-over-year operating income and EBITDA performance. During the nine months ended Sept. 30, 2002, Expanets has increased operating income by $99.1 million and EBITDA by $102.1 million over the same period in 2001. This positive trend is a result of Expanets' continued ability to effectively respond to challenging market conditions by reducing its general and administrative costs, capitalizing on its current market opportunities and focusing on higher-margin services such as maintenance contract sales," Hylland said. "As a result, Expanets has improved gross margins as a percentage of revenues to 44.2 percent in the third quarter of 2002 and 42.3 percent for the nine months of 2002, compared with gross margins as a percentage of revenues of 41 .4 percent for the third quarter of 2001 and 36.6 percent for the nine months of 2001. Expanets maintained a trend of reducing selling, general and administrative (SG&A) expenses as a percentage of revenues in the third quarter of 2002 to 31.9 percent, from 43.9 percent of revenues in the third quarter of 2001

\* \* \*

In overview, Hylland said, "**NorthWestern's management is continuing to focus on improving efficiencies through our targeted operational excellence initiatives. These initiatives are resulting in significant annualized SG&A reductions in 2002 and additional improvements are targeted for 2003.** We will also continue to focus on enhancing customer service capabilities and driving internal revenue growth." (Emphasis added.)

\* \* \*

67. On November 15, 2002, the NorthWestern Defendants caused NorthWestern to file with the SEC its Form 10-Q for third quarter 2002 which was signed by defendant Orme. In the 10-Q, defendants represented that "all adjustments necessary for a fair presentation of the results of operations for the interim periods have been included." In addition, defendants Merle Lewis

and Kipp Orme certified that the "quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report." The Northwestern Defendants repeated the financial results reported in the November 7, 2002 press release and represented that the Company had an operating loss of $41 million. As the public would learn on April 16, 2003, the Company actually had an operating loss of $55.4 million for that quarter.

68. Defendants knew or recklessly disregarded that the results reported in the November 7, 2002 press release and the November 14, 2002 Form 10-Q were materially false and misleading because the Company's financial performance was artificially inflated and because the Company maintained inadequate reserves for accounts receivable at the Company's subsidiary, Expanets. Moreover, defendants' public statements failed to disclose problems with implementation of the Expert software platform, and billing lapses and data conversion issues in customer accounts stemming from the implementation of Expanets' enterprise software platform, which was a significant part of the Company's "operational excellence initiatives" touted in the press release.

69. On December 13, 2002, the NorthWestern Defendants caused NorthWestern to issue a press release titled, "NorthWestern Lowers Guidance For Estimated 2002 Results." The press release announced that the Company needed to increase its reserves at Expanets by "at least $50 million" for accounts receivable and "billing lapses" and "data conversion issues" related to the implementation of the Expert software platform. The press release included a statement by defendant Lewis and stated in pertinent part:

29

## NorthWestern Lowers Guidance For Estimated 2002 Results

Year-End Charges Being Reviewed
Utility Results To Meet Performance Expectations

SIOUX FALLS. S.D. — Dec. 13, 2002 — NorthWestern
Corporation (NYSE:NOR) today announced that it will miss
previously disclosed earnings estimates for full-year 2002 of
between $1.50 to $1.60 per share from continuing operations. **The
expected lower 2002 results stem from North Western's need
to significantly increase reserves for accounts receivable and
billing adjustments at its communications services business,
Expanets,** and lower than expected operating performance at
Expanets and Blue Dot, the Company's heating, ventilation and air
conditioning business.

In connection with its year-end audit, North Western is also
undertaking SFAS Nos. 142 and 144 reviews of the value of
intangible assets of Expanets and Blue Dot. Due to the increase in
reserves at Expanets and current operating performance of
Expanets and Blue Dot, NorthWestern may recognize a substantial
impairment of goodwill and other intangible assets for these
businesses and take a noncash charge that would materially affect
North Western's 2002 operating results. Until the Company
completes its year-end closing and audit process, NorthWestern
will be unable to provide actual full-year 2002 results.

North Western reaffirmed that it will meet its previously
announced 2002 performance targets for its core regulated electric
and natural gas utility business, which comprises the substantial
majority of its annual consolidated operating income.

**NorthWestern is currently evaluating the adequacy of reserves
at Expanets for the collection of accounts receivable and billing
adjustments related to previously disclosed billing lapses and
data conversion issues in customer accounts stemming from
the implementation of Expanets' enterprise software platform.**
In addition, Expanets expects to reflect a reduction in both
maintenance and core services revenues in its fourth quarter 2002
results. **NorthWestern has determined it will increase
receivable and other reserves at Expanets by at least $50
million. The Company may determine after it has completed
its evaluation as a part of its year-end closing and audit process
that it is necessary to further increase reserves, as well as to
determine the impacts, if any, to prior reported quarterly
results for 2002.** The anticipated increase in reserves, and any

additional increases, will adversely affect NorthWestern's and Expanets' results, (Emphasis added.)

As previously reported, Expanets is in negotiations with Avaya, Inc. which had previously been providing customer data and billing management services to Expanets under transition service agreements, regarding certain outstanding claims Expanets believes it has regarding, among other matters, acquired maintenance contracts and data conversion issues. Resolution of Expanets' claims may result in mitigation of portions of the damages reflected in the anticipated. increase in reserves.

As a result of continued soft market conditions in the communications sector in the fourth quarter of 2002 and the anticipated increase in reserves, NorthWestern expects earnings before interest, taxes, depreciation and amortization (EBITDA) for Expanets for 2002 to fall substantially below the previously announced range of $73 million to $80 million.

The Company also expects EBITDA at Blue Dot to be slightly lower than previously anticipated for the fourth quarter of 2002 and, as a result, projects that EBITDA for full-year 2002 will fall below the previously announced range of $13 million to $16 million.

"We are disappointed with the ongoing implementation issues related to Expanets' system conversion as well as weaker than expected results from operations at Expanets and Blue Dot," said Merle D. Lewis, North Western's chairman and chief executive officer. "We will continue to focus on operational excellence initiatives that we believe will lead to improved performance at these subsidiaries in future periods."

Additional Year-End Adjustments — SFAS Nos. 142 and 144 Reviews

NorthWestern is in the process of conducting its annual assessment of goodwill and other indefinite life intangible assets under Statement of Financial Accounting Standards No. 142 and other intangible assets under Statement of Financial Accounting Standards No. 144. The SEAS Nos. 142 and 144 analyses could result in a substantial impairment of goodwill and other intangible assets at Blue Dot and Expanets and the incurrence of a significant noncash charge relating to a write-down of goodwill and other intangible assets as a result of lower than previously anticipated earnings and increased reserves. The assessment and determination

under SFAS Nos. 142 and 144 will be made by the Company in consultation with its independent valuation specialists and with its auditors in connection with their audit of the Company's 2002 financial statements following year-end. A significant noncash charge would adversely affect NorthWestern's net income for 2002.

70. Subsequently, on February 19, 2003, the NorthWestern Defendants issued a press release entitled "North Western Corporation Outlines Turnaround Plan," announcing that the Company would take approximately $700 million in charges, including the previously announced $50 million increase in Expanets' reserves and "intangible asset impairment charges" for the Blue Dot and Expanets subsidiaries. The press release stated in pertinent part:

> As announced on Dec. 13, 2002, NorthWestern is completing its review of the value of intangible assets of Expanets and Blue Dot under SFAS Nos. 142 and 144 as part of its year-end audit. On Nov. 7, 2002, NorthWestern reiterated that it wrote down the value of its investment and financial arrangements in the discontinued operations of CornerStone Propane.
>
> The Company also announced on Dec. 13, 2002, that it is evaluating the adequacy of reserves at Expanets for the collection of accounts receivable and billing adjustments related to previously disclosed billing lapses and data conversion issues in customer accounts stemming from the implementation of Expanets' enterprise software platform.
>
> **NorthWestern said that as a result of these steps, it expects to report a total of approximately $700 million in primarily noncash charges in its 2002 results**. The Company expects to release its fourth quarter and full-year 2002 results in March. The expected charges break down as follows:
>
> **-- Noncash goodwill and intangible asset impairment charges of approximately $280 million for Blue Dot and $245 million for Expanets.**
> -- Previously recorded noncash charges of $101 million to write down the Company's investment, financial arrangements and operating losses in the discontinued, operations of CornerStone Propane.
> **--Previously announced increase of Expanets' reserves by more than $50 million for accounts receivable and billing**

32

**adjustments stemming from implementation of Expanets'
enterprise software system.**
(Emphasis added.)

## THE TRUTH IS REVEALED

71. On April 16, 2003, the Company issued a press release announcing that it had restated

its previously reported financial results for the first three quarters of 2002 and taken a $878.5

million charge, including the following:

* Impairment of Blue Dot goodwill and other long-lived
  assets of $301.7 million

* Impairment of Expanets goodwill and other long-lived
  assets of $288.7 million

* Discontinued operations of CornerStone Propane, net of tax
  benefits of $101.7 million

* Valuation allowance for deferred tax asset of $71.5 million

* Expanets billing adjustments and accounts receivable write-
  offs and reserves of $65.8 million

* Impairment of Montana First Megawatts project of $35.7
  million

* Retirement of acquisition term loan, net of tax benefits of
  $13.4 million.

72. On April 16, 2003, the NorthWestern Defendants caused NorthWestern to file an

amended Quarterly Reports on Form 10-Q/A for the periods ended March 31, 2002, June 30,

2002, and Sept. 30, 2002 to restate the previously reported (but materially misleading) financial

results and to include additional disclosures in the appropriate periods related to:

* billing adjustments reducing revenues and increasing in
  accounts receivable reserves and write-offs resulting from
  significant deficiencies in Expanets' Expert billing and
  collection system;

33

    *       the inadequacy of data to support recording certain
revenues on a percentage of completion basis, thereby
requiring utilization of completed contract revenue
recognition methodology for such revenues and cost
recognition;

    *       the impact resulting from the finalization of the purchase
accounting for the acquisition of the Montana utility
operations;

    *       the reversal of losses previously allocated to minority
shareholders of Blue Dot as a result of the finalization of
the purchase accounting for acquisitions made in 2002;

    *       the timing, amount and disclosure of adjustment to certain
accruals;

    *       the quarterly impact of certain other adjustments.

73. From the Form 10-K that the Company filed on April 16, 2003, the public learned for
the first time that defendants actually began experiencing severe problems with the Expert
System as soon as it was implemented in November 2001 and that, as a result, defendants could
not obtain critical information in order to prepare financial statements that were not materially
misleading. In addition, the public learned that there were "substantial weaknesses in Expanets'
internal controls and procedures during 2002."

74. On April 25, 2003 Moody's Investor Service downgraded the Company's debt rating
because of (1) concerns about the Company's high total adjusted debt load and poor coverage
ratios; (2) expectations that the Company's operating cash flow will continue to be very low
relative to the Company's high debt level; (3) Moody's view that it will be difficult for the
Company to materially reduce its debt burden over time; (4) the Company's negative net worth
following the approximately $878 million in charges that the Company recently took; (5)
admissions by the Company's management that there are weaknesses in the Company's financial

reporting and controls; and (6) other uncertainties about NorthWestern, including government investigations of the Company and its improper accounting and financial practices.

75. On May 15, 2003 it was publicly reported that the SEC began an investigation of NorthWestern's business practices.

76. During the Class Period NorthWestern's 7.20% Preferred Securities had traded at more than $20 per share but by the end of the Class Period had dropped below $7.50 per share.

77. During the Class Period NorthWestern's 8.25% Preferred Securities had traded at up to $25 per share but by the end of the Class Period had dropped below $10.00 per share.

78. During the Class Period NorthWestern's 8.10% Preferred Securities had traded up to $25 per share but by the end of the Class Period had dropped below $7.50 per share.

**Applicability Of Presumption Of Reliance:  Fraud-On-The-Market Doctrine**

79. At all relevant times, the market for NorthWestern's Preferred Securities was an efficient market for the following reasons, among others:

(a)      NorthWestern's Preferred Securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and open market;

(b)      As a regulated issuer, NorthWestern filed periodic public reports with the SEC and the NYSE;

(c)      NorthWestern regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     NorthWestern was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

80. As a result of the foregoing, the market for NorthWestern's Preferred Securities promptly digested current information regarding NorthWestern from all publicly available sources and reflected such information in the price of NorthWestern's Preferred Securities. Under these circumstances, all purchasers of NorthWestern's Preferred Securities during the Class Period suffered similar injury through their purchase of NorthWestern's Preferred Securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### (Against All Defendants For Violations
### Of Section 11 Of The Securities Act)

81. Plaintiff repeats and realleges each and every allegation contained except for those allegations sounding in scienter.  Plaintiff specifically excludes from this Count any and all allegations concerning defendants' state of mind, including defendants' knowledge or recklessness.

82. This Count is brought by plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of himself and the other members of the Class, against all defendants and does not sound in fraud.

83. The Registration Statement for each Offering by defendants was materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to adequately disclose material facts as described above.

84. The Company, the NorthWestern trusts and the Underwriter Defendants are the registrant for each Offering that is the subject of this action.  The defendants named herein were responsible for the contents and dissemination of each Registration Statement.

85. As the issuer of the shares, the Company and/or the respective NorthWestern Trust and/or the Underwriter Defendants are strictly liable to plaintiff and the Class for the misstatements and omissions.

86. None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in each Registration Statement were true and without omissions of any material facts and were not misleading.

87. Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in each Registration Statement, which misrepresented or failed to disclose, inter alia, the material facts set forth above.

88. By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

89. Plaintiff acquired the Company's securities issued pursuant to, or traceable to, and in reliance on, defendants' Registration Statement.

90. Plaintiff and the Class have sustained damages. The value of the Company's securities has declined substantially subsequent to and due to defendants' violations.

91. At the times they purchased the Company's securities, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the end of the Class Period.

92. Less than one year elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this Complaint. Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public to the time plaintiff filed his Complaint.

# COUNT II

## (Against Defendants For
## Violations Of Section 12(a)(2) Of The Securities Act)

93. This claim is asserted on behalf of all class members who purchased or acquired the Preferred Securities issued by the Company. This claim does not sound in fraud, and plaintiff does not incorporate herein any allegations of fraud in connection with this Count.

94. By means of a Prospectus and Registration Statement, and by using means and instruments of transportation and communication in interstate commerce and of the mails, defendants, through public offerings, offered and sold the Preferred Securities. As previously set forth herein, defendants' Prospectuses and Registration Statements included untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

95. Defendants are sellers within the meaning of the Securities Act because they: (a) transferred title to plaintiff and other purchasers of the Preferred Securities; (b) transferred title to the Preferred Securities to other underwriters and/or broker-dealers that sold the Preferred Securities as agents for the Company and the Underwriter Defendants; and (c) solicited the purchase of the Preferred Securities by plaintiff and other members of the Class, motivated at least in part by the desire to serve their own financial interest.

96. Defendants actively solicited the sale of the Preferred Securities by participating in "road show" meetings in furtherance of the Offerings.

97. Plaintiff and the other Class members purchased the Preferred Securities based on a Prospectus and Registration Statement, or in the immediate wake of the Offerings and traceable thereto, and have been damaged.

98. Plaintiff did not know of the omissions and misstatements described above when he purchased the Preferred Securities.

99. Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

100.    By virtue of the foregoing, Defendants have violated Section 12(a)(2) of the Securities Act.

## COUNT III

### (Against The Individual Defendants For Violations of Section 15 of the Securities Act)

101.    Plaintiff repeats and realleges each and every allegation contained above except for the allegations sounding in scienter.

102.    This Count is brought by plaintiff pursuant to Section 15 of the Securities Act against the Individual Defendants and does not sound in fraud.

103.    Each Individual Defendant was a control person of the Company and the NorthWestern trusts by virtue of their positions as directors and/or as senior officers of the Company and the NorthWestern trusts.  The Individual Defendants also served on the Company's Board of Directors or participated in meetings of the Board of Directors.  The Individual Defendants also each had a series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of the Company.

104.    Each Individual Defendant was a culpable participant in the violations of the Securities Act alleged in Counts I and II above based on their having signed each Registration Statement and having otherwise participated in the process which allowed each Offering to be successfully completed.

## COUNT IV

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and

39

misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107.    Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of NorthWestern publicly traded Preferred Securities during the Class Period.

108.    Defendants (a) employed devices, schemes, and artifices to defraud: (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Preferred Securities in an effort to maintain artificially high market prices for NorthWestern's Preferred Securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged herein.

109.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of NorthWestern as specified herein.

misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107.    Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of NorthWestern publicly traded Preferred Securities during the Class Period.

108.    Defendants (a) employed devices, schemes, and artifices to defraud: (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Preferred Securities in an effort to maintain artificially high market prices for NorthWestern's Preferred Securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged herein.

109.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of NorthWestern as specified herein.

110.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NorthWestern's value and performance and continued substantial growth which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about NorthWestern and its business operations and future prospects in the light of the circumstances under which they were made, not misleading as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of NorthWestern Preferred Securities during the Class Period.

111.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control of the Company and the NorthWestern trusts; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company and the NorthWestern trusts was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

112.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NorthWestern's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' material misstatements and omissions about the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

113.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NorthWestern's Preferred Securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of NorthWestern' s publicly traded Preferred Securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities made, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not fully disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired NorthWestern Preferred Securities during the Class Period at artificially high prices and were damaged thereby.

114.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the

other members of the Class and the marketplace known the truth regarding the problems that NorthWestern was experiencing, which were not fully disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their NorthWestern Preferred Securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

115.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

116.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT V

### PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

117.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118.     The Individual Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled the Company, the NorthWestern trusts, other employees of NorthWestern, and the Company controlled the Individual Defendants and each of its officers, executives and all of its employees as well as the NorthWestern trusts. By reason of such conduct, the NorthWestern Defendants are liable pursuant to §20(a) of the 1934 Act.

119.     The Individual Defendants acted as controlling persons of NorthWestern within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company and the NorthWestern trusts, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

120.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

121.    As set forth above, NorthWestern and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment:

1.    Determining that the instant action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding compensatory damages and/or rescission as appropriate against defendants, in favor of plaintiff and all members of the Class for damages sustained as a result of defendants' wrongdoing;

3.      Awarding plaintiff and members of the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

4.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:      May 23, 2003

SQUITIERI & FEARON, LLP

By:_____

Lee Squitieri (LS-1684)
Stephen J. Fearon, Jr. (SF-8119)
420 Fifth Avenue
18th Floor
New York, New York 10018
(212) 575-2092

KENNETH A. WEXLER AND ASSOCIATES
Kenneth A. Wexler
One North LaSalle Street
Suit 2000
Chicago, Illinois 60602
(312) 346-2222

Attorneys for Plaintiff

## PLAINTIFF'S SWORN CERTIFICATION

I, Arthur Laufer, certify that:

1.      I have reviewed the complaint and authorized its filing.

2.      I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follow:

| Date | Purchase/Sale | # of Share | Price Per Share |
|------|---------------|------------|-----------------|
| 01/25/02 | Purchase | 1000 | $25.00 |
| 03/17/03 | Sold | 500 | $12.50 |

5.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

6.      In the three-year period preceding the date of this Certification, I have sought to serve as a representative party on behalf of class in the matter of Laufer v. Lucent Technologies, Inc., et al., (Civil Action No.: 2:01 CV 05229 (JAP)) pending in the District of New Jersey.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Dated: April ___, 2003

ARTHUR LAUFER

Address:  7518 Union Street
         Apt. 4B,
         Flushing New York 11354